**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| **OMNICARE, INC.,** ) | Case No. 1:05 CV 2609 |
| ) | |
| **Plaintiff,** ) | Judge Dan Aaron Polster |
| ) | |
| vs. ) | **MEMORANDUM OF OPINION** |
| ) | **AND ORDER** |
| **PROVIDER SERVICES, INC.,** *et al.*, ) | |
| ) | |
| **Defendants.** ) | |

This case is before the Court on Plaintiff Omnicare, Inc.'s Motion for Order Disqualifying Geoffrey E. Webster, Esq. and the law firm of Geoffrey E. Webster, Attorneys at Law (the "Disqualification Motion") (**ECF No. 12**). For the following reasons, the Disqualification Motion is **GRANTED**.

**I.**

The Complaint alleges the following facts. Plaintiff Omnicare, Inc. is engaged in the business of providing pharmaceutical and respiratory goods and services through licensed pharmacies, assisted living and nursing home facilities throughout the United States. *ECF No. 1* ("Compl.") ¶ 1. Defendant Provider Services, Inc. owns and operates, leases and/or manages assisted living and long-term care nursing facilities in the State of Ohio. *Id*. ¶ 2. Defendant Brian Colleran is the principal owner and president of Provider Services. *Id*. ¶ 4.

In July 2003, Provider Services entered into a Preferred Provider Agreement ("PPA") with Omnicare for an initial term of four years. *Compl*. ¶ 7. (The PPA is located at *Compl., Ex. 1*). Pursuant to the PPA, Provider Services designated Omnicare as the exclusive provider of pharmacy and respiratory services to Provider Services' facilities, *id*. ¶ 8, and the pharmacy of choice and preferred provider of pharmacy and respiratory services "for all current and future Provider Facilities and their residents," *id*. ¶ 9.[1] The PPA prohibited Provider Services from entering into an agreement with any person or entity other than Omnicare for the provision of these services. *Compl*. ¶ 10. It required Provider Services to provide Omnicare with a written list of its facilities together with a description of every pre-existing agreement for pharmacy and respiratory services those facilities had, the date such agreements expired, the earliest date on which such agreements could be terminated and the terms under which Provider Services could terminate those agreements prior to expiration. *Id.* ¶ 11. If a Provider Services' facility did not have an existing contract for pharmacy or respiratory services as of July 7, 2003, or a facility became a Provider Services' facility after that date, Provider Services was required to cause that facility to enter in to a contract for those services with Omnicare. *Id*. ¶ 12.

In August 2004, Brian Colleran met with a sales and marketing employee of Omnicare, complained that Omnicare was "making too much money," and solicited that employee to quit Omnicare and start a pharmacy with Colleran and Provider Services. *Compl.* ¶ 14. The employee declined the solicitation and warned Colleran about breaching the PPA's provisions. *Id*.

---

[1] According to Omnicare, the only notable exceptions to Omnicare's exclusive rights were if an individual resident or a resident's sponsor elected to use another pharmacy or if the Provider Services' facility was located outside Omnicare's service area. *Compl*. ¶ 9.

-2-

In January 2005, Geoffrey Webster, Esq., at the behest of Colleran, organized Defendant Pure Service Pharmacy, LLC in the State of Ohio. *Compl*. ¶ 15. Colleran is a 28.8% owner of Pure Service Pharmacy. *Id*. The other owners of Pure Service Pharmacy are 5440 Consulting, LLC and 2323 Medical Holdings, LLC. *Id*. The address provided to the Ohio Secretary of State by 5440 Consulting, LLC is that of Attorney Webster's law office, and its statutory agent is J. Randall Richards, Esq., Webster's associate – who also serves as the statutory agent for 2323 Medical Holdings, LLC. Id.

At a lunch meeting with the same Omnicare employee in May 2005, Colleran disclosed that he and Provider Services had acquired three nursing care facilities and that Colleran and Provider Services were planning to open their own pharmacy, Pure Service Pharmacy, on July 1, 2005. *Compl*. ¶ 16. Colleran informed the Omnicare employee that he was giving Provider Services' Yorkland Park Care Center's pharmacy business to Pure Service Pharmacy. *Id*. The employee warned Colleran that his plans would breach the PPA and that Omnicare would likely bring suit. *Id*. Colleran replied that "Omnicare is a bunch of jerks" with "oodles of attorneys," but "[m]y attorney and I are ready for it and we are building a war chest." *Id*. Colleran also disclosed that his attorney had reviewed the PPA and could not believe how strong the language was in favor of Omnicare. Colleran said that Omnicare was arrogant for securing Provider Services' future business. *Id*.

On June 28, 2005, Omnicare sent a letter to Provider Services and Colleran providing notice that Provider Services was in breach of the PPA and demanding that Provider Services comply with the PPA's express terms. *Compl*. ¶ 17. Among other things, Omnicare stated that it appeared Provider Services had no intention of having its new facilities (Yorkland

-3-

Park Care Center, Valley View Nursing & Rehab Center and Riverside Country Care Center) execute exclusivity agreements with Omnicare to provide pharmacy and respiratory services to those facilities, and that Provider Services failed to provide the required notice of new facilities. *Id*.

In July 2005, Colleran informed staff members at Provider Services' Villa Angela Care Center facility that Provider Services was starting its own pharmacy. *Compl*. ¶ 19. Pure Service Pharmacy began providing pharmacy goods and services to the Yorkland Park Care Center, and Colleran has begun marketing Pure Service Pharmacy to other Provider Services' facilities in Ohio. *Id*. ¶¶ 20-21.

On November 4, 2005, Omnicare commenced the instant action against Defendants Provider Services, Inc., Pure Service Pharmacy, LLC, and Brian Colleran alleging the following claims: breach of contract against Provider Services, Inc. (Count I); tortious interference with contract/business relationships against Pure Service Pharmacy, LLC (Count II); and tort interference with contract/business relationships against Brian Colleran (Count III).

On November 28, 2005, Defendants filed a Motion to Dismiss of Defendants, Provider Services, Inc., Pure Service Pharmacy, LLC, and Brian Colleran. *ECF No. 9*. Defendants asked the Court to dismiss the tortious interference claims alleged in Counts II and III for failure to state a claim. *Id*. The Court denied the motion as premature because Defendants attached affidavits to their motion which raised factual issues and discovery had not yet commenced. *ECF No. 17*.

On January 12, 2006, Omnicare filed the instant Disqualification Motion. This Motion has been fully briefed. *See ECF Nos. 12, 16, 21*.

**II.**

Omnicare has moved to disqualify Attorney Webster and his law firm on the ground that he will be called as a witness by both sides in this litigation. "Because the roles of advocate and witness are inconsistent, it is generally inappropriate for a trial attorney to testify on behalf of the client." *Amos v. Cohen*, 156 Ohio App.3d 492, 495 (2004) (citing Mentor Lagoons, Inc. v. Rubin, 31 Ohio St.3d 256, 257 (1987)). Disciplinary Rule ("DR") 5-102(A) of Ohio's Code of Professional Responsibility addresses the propriety of an attorney representing a client when it is obvious that he will be called as a witness on behalf of that client. It provides:

> If, after undertaking employment in contemplated or pending litigation, a lawyer learns or it is obvious that he or a lawyer in his firm ought to be called as a witness on behalf of his client, he shall withdraw from the conduct of the trial and his firm, if any, shall not continue representation in the trial, except that he may continue the representation and he or a lawyer in his firm may testify in the in the circumstances enumerated in DR 5-101(B)(1) through (4).

*Id*. Under DR 5-101(B)(1) to (3), a lawyer may continue to represent his client and be a witness on his client's behalf only if the testimony will relate solely to an uncontested matter, the nature and value of legal services, or a matter of formality and there is no reason to believe that substantial evidence will be offered in opposition to the testimony. The lawyer may also continue to be an advocate as well as a witness if disqualification would work a substantial hardship on its client. DR 5-101(B)(4).

In interpreting DR 5-102(A), the Ohio Court of Appeals has explained:

> The justification for the advocate-witness rule appears in the Ethical Considerations, which are aspirational in character and represent those objectives toward which every attorney should strive. EC 5-9 states that "[a]n advocate who becomes a witness is in the unseemly and ineffective position of arguing his own credibility." *See 155 N. High Ltd. v. Cincinnati Ins. Co.* (1995), 72 Ohio St.3d 423, 426-27, . . . "Where the question arises, doubts should be resolved in favor of the lawyer testifying and against his becoming or continuing as an

> advocate." EC 5-10. Unlike other rules, DR 5-102(A) makes no allowance for a waiver by the client of the rule against a lawyer serving in the dual rule of advocate and witness. The purpose of the rule is to protect the interests of the client and the adverse party, as well as the institutional integrity of the legal system. *See Ohio Bd. of Commrs. on Grievances and Discipline Ops*. 2003-5, at 4-5; *see also 155 N. High Ltd v. Cincinnati Ins. Co.*, 72 Ohio St.3d at 427, . . ..

*Amos*, 156 Ohio App.3d at 495-96 (parallel citations omitted). "Courts have held that, when one lawyer is disqualified under DR 5-102(A) because he will testify as a witness, his entire law firm and all other lawyers in it must also be disqualified." *Reed Elsevier, Inc. v. THELAW.net Corp.*, 197 F.Supp.2d 1025, 1027 (S.D. Ohio 2002) (citing *Universal Athletic Sales Co. v. Am. Gym, Rec. & Athletic Equip. Corp., Inc.*, 546 F.2d 530, 538 (3rd Cir. 1976); *Estate of Andrews v. United States*, 804 F.Supp. 820, 830 (E.D. Va. 1992); *Mason & Dixon Lines, Inc., v. Glover*, 1989 WL 135219 (N.D. Ill. 1989)).

The Ohio Supreme Court has promulgated a two-step analysis for ruling on a motion to disqualify under DR 5-102(A). First, the court must determine (1) whether, without reference to DR 5-102(A), the attorney's testimony is admissible, and (2) whether the exceptions in DR 5-101(B)(1)-(4) apply. *Amos*, 156 Ohio App.3d at 496 (citing *Mentor Lagoons*, 31 Ohio St.3d at 260). "In making these determinations, the court is not deciding whether a Disciplinary Rule will be violated, but rather preventing a potential violation of the Code of Professional Responsibility." *Williams v. White*, No. 2001-P-0072, 2002 WL 818883, at *2 (Ohio App. 11 Dist. Apr. 30, 2002) (quoting *Mentor Lagoons*, 31 Ohio St.3d at 260).

**III.**

In Count II of the Complaint, Omnicare has alleged a claim against Defendant Pure Service Pharmacy for tortious interference with Omnicare's contract with Provider Services and Omnicare's business relationship with Provider Services' facilities. Pure Service Pharmacy

-6-

is a three-member limited liability company of which Attorney Webster is the "Managing Member."[2]  As Managing Member of Pure Service Pharmacy, Attorney Webster's knowledge regarding the PPA is relevant to his clients' defense.  This is made obvious by Defendants' argument in their now-moot motion to dismiss.

Defendants argued, among other things, that Count II should be dismissed for failure to state a claim because the second element of the tort requires Omnicare to establish that Pure Service Pharmacy had knowledge of the PPA, and Pure Service Pharmacy "had no knowledge of the PPA."  *ECF No. 9*, at 5.  Defendants further argued:

> Omnicare asserts that Pure Service did have knowledge through its managing Partner, Geoffrey E. Webster, and its investor, Brian Colleran.  Complaint, p. 13.  This assertion is erroneous.  <u>Geoffrey Webster was not made aware of the existence of the terms of the PPA until September 2005</u>, nearly six months after the alleged interference occurred.  See, Exhibit 1, Affidavit of Brian Colleran, at ¶ 9.  Geoffrey Webster did not represent Provider Services with regard to the PPA nor did he represent Provider Services with respect to the acquisition of Yorkland Park Care Center, a Provider Services facility.  Exhibit 1, ¶¶ 7, 8.  Also, <u>Geoffrey Webster never discussed the terms, conditions, and provisions of the PPA with those engaged in the day to day operations of Pure Service</u>.  See, Exhibit 2, Affidavit of [Pure Service CEO] Jerry Curtis Ayers, at ¶¶ 2, 4.  <u>It is not possible for Pure Service to have knowledge of the PPA through Geoffrey Webster</u>.
>
> Further, Brian Colleran had no active role in the day to day operations of Pure Service.  Exhibit 1, ¶ 4.  His role is limited to that of a passive investor.  Exhibit 1, ¶¶ 3, 4.  <u>He did not discuss the PPA with anyone affiliated with or employed by Pure Service prior to September 2005, that person being Geoffrey Webster</u>.  Exhibit 1, ¶ 6.  He never discussed the terms and conditions of the PPA with Curt Ayers, Chief Executive Officer of Pure Service.  Exhibit 2, ¶ 6.  In fact, the first time anyone involved in the day to day operations of Pure Service and with responsibility to contract on behalf of Pure Service was November 16, 2005 when Curt Ayers received the Complaint in this matter.  Exhibit 2 ¶ 5.

---

[2]As managing member of a limited liability company, he must perform his duties "in good faith, in a manner he reasonably believes to be in or not opposed to the best interests of the company, and with the care that an ordinarily prudent person in a similar position would use under similar circumstances."  O.R.C. 1705.29(B).

> <u>No one involved in the operational side of Pure Service had any knowledge that the PPA even existed at the time of the alleged interference</u>. <u>The only one who may have had knowledge was a passive investor who had no contact with those responsible for contracting on behalf of the company</u>. To allege that the investor's knowledge of the PPA is tantamount to knowledge on the part of the company itself is akin to alleging that the knowledge possessed by the holder of a single share of IBM stock imputes knowledge to that company for purposes of tortious interference.
>
> As <u>Pure Service did not have knowledge of the PPA</u>, Omnicare fails to meet the second element of the tort and its claim must fail accordingly.

*Id*. at 5-7 (emphasis added).

The Court finds that the knowledge (or lack of knowledge) which the three members of Pure Service Pharmacy possessed regarding the PPA, along with the time at which they acquired that knowledge, is going to be a factual issue hotly contested in this case and one that is essential to Pure Service Pharmacy's defense of Count II. No one other than Attorney Webster can testify regarding his knowledge. The Court thus finds that it is "obvious" that Attorney Webster will be a witness on behalf of Pure Service Pharmacy, and that his testimony regarding his knowledge of the PPA will be admissible. *Amos*, 156 Ohio App.3d at 496 (citing *Mentor Lagoons*, 31 Ohio St.3d at 260).

In addition, Attorney Webster's testimony does not fall within any of the exceptions set forth in DR 5-101(B). *Id*. That is, his testimony will not relate solely to an uncontested matter, the nature and value of his legal services, or a matter of formality. Nor will his disqualification work a substantial hardship to his client. The Court has not conducted the first case management conference which is scheduled for March 6, 2006, and discovery has not yet begun.

Because Attorney Webster's testimony is admissible, and none of the exceptions in DR 5-101(B)(1)-(4) apply, the Court concludes that Attorney Webster must be disqualified. Moreover, because the Court is disqualifying Attorney Webster under DR 5-102(A), his law firm must also be disqualified from representing any of the Defendants in this case. *Reed Elsevier*, 197 F.Supp.2d at 1027; *Universal Athletic Sales Co.*, 546 F.2d at 538; *Estate of Andrews*, 804 F.Supp. at 830. The Court notes that it is not deciding whether a Disciplinary Rule will be violated, but preventing a potential violation of the Code of Professional Responsibility. *Mentor Lagoons*, 31 Ohio St.3d at 260; *Williams v. White*, 2002 WL 818883, at *2.

## IV.

There is an additional basis for disqualifying Attorney Webster. DR 5-102(B) addresses a situation where counsel learns or it is obvious that he or a lawyer in his firm will be called by the opposing party. *Waliszewski v. Caravona Builders, Inc.*, 127 Ohio App.3d 429, 432 (1998). DR 5-102(B) provides:

> If, after undertaking employment in contemplated or pending litigation, a lawyer learns or it is obvious that he or a lawyer in his firm may be called as a witness other than on behalf of his client, he may continue the representation until it is apparent that his testimony is or may be prejudicial to his client.

*Id*. "[I]t is the burden of the party moving for disqualification of an attorney to demonstrate that the proposed testimony may be prejudicial to that attorney's client and that disqualification is necessary." *Waliszewski*, 127 Ohio App.3d at 433. However, "[w]here the question arises, doubts should be resolved in favor of the lawyer testifying and against his becoming or continuing as an advocate." Ethical Consideration 5-11.

-9-

Omnicare has presented evidence in the form of correspondence to and from Attorney Webster that establishes his actual knowledge of the PPA and contradicts the sworn testimony of Defendant Brian Colleran. Specifically, Colleran has averred that Attorney Webster had no knowledge of the PPA until September 2005. Correspondence between the parties, however, shows that Attorney Webster had knowledge of the PPA as early as June 2005. Because of this discrepancy, Omnicare has stated its intention to call Attorney Webster as a witness to impeach the testimony of Webster's client, Brian Colleran. *See ECF No. 21*, at 1-4. The Court concludes that Omnicare has carried its burden of demonstrating that Attorney Webster's anticipated testimony may be prejudicial to his client and that disqualification is necessary under DR 5-102(B). *Waliszewski*, 127 Ohio App.3d at 433. Attorney Webster is also disqualified under DR 5-102(B) because ethical considerations dictate that any doubts should be resolved against his continued advocacy. EC 5-11.

**V.**

For all these reasons, Plaintiff Omnicare, Inc.'s Motion for Order Disqualifying Geoffrey E. Webster, Esq. and Geoffrey S. Webster, Attorneys at Law (**ECF No. 12**) is hereby **GRANTED**.

**IT IS SO ORDERED.**

*/s/Dan Aaron Polster    2/21/2006*
**Dan Aaron Polster**
**United States District Judge**